UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

RODERICK D. LEE,

                Plaintiff,

vs.                              Case No. 2:06-cv-541-FtM-29SPC

TIMOTHY J. BUDZ; DR. JACQUES LAMOUR
and BARBARA J. PEDERSON, R.N.,

                Defendants.
_____

**OPINION AND ORDER**

**I.**

This matter comes before the Court upon review of Defendants' Motion for Summary Judgment (Doc. #97, Motion) filed September 30, 2008 on behalf of Defendants Budz, Lamour and Pederson. Defendants attach to their Motion the following exhibits: Copy of the Second Amended Complaint (Exhibit A); Plaintiff's Emergency Motion to Compel Defendants to Send Plaintiff to Outside Medical Treatment filed September 6, 2007 (Exhibit B); Defendants' Response to Plaintiff's Emergency Motion filed September 10, 2007 (Exhibit C); Plaintiff's Medical File from his confinement at the Florida Civil Commitment Center ("FCCC") (Exhibit D)[1]; Affidavit of Dr. Jacques

_____

[1]Exhibit D, as originally electronically filed, was identified by bates stamp numbers starting with LEE00201. On August 6, 2009, Defendants filed a Supplement to Exhibit D (Docs. ##107-112, Supplement to Exhibit D), which contain documents identified with bates stamp numbers LEE00001 through LEE0200 and are part of Plaintiff's medical file at the FCCC. These documents inadvertently were not included in Exhibit D as originally filed, but were cited to and referenced in Defendants' Motion. For purposes of clarity,

(continued...)

Lamour, dated September 30, 2008 (Exhibit E); Affidavit of Timothy J. Budz, dated September 30, 2008 (Exhibit F). *Pro se* Plaintiff filed a Response to the Motion (Doc. #101, Response), citing to Federal Rule Civil Procedure 56(f) and arguing that Defendants' refusal to respond to Plaintiff's untimely discovery requests rendered him unable to adequately respond to the Motion. Consequently, in an abundance of caution, the Court postponed ruling on Defendants' Motion and permitted Plaintiff to pursue limited discovery in this matter. See Order of Court dated May 19, 2009 (Doc. #105). Further, the Court directed Plaintiff to file an amended response, if any, to Defendants' Motion on or before July 10, 2009. Id. at 2, ¶2. The Court further advised Plaintiff that if he failed to file a timely amended response, the Court would deem Defendants' Motion ripe for review without the benefit of a further response by Plaintiff. Id. at 3, ¶3. As of the date of this Order, Plaintiff has not filed an amended response and the time for doing so has expired. Consequently, this matter is now ripe for review without the benefit of Plaintiff's amended response.

---

[1](...continued)
the Court will refer to documents contained in Exhibit D and the Supplement to Exhibit D by the last three numerical digits in the bates stamp sequence, i.e., Exhibit D and Supplement to Exhibit D at 121.

**II.**

Plaintiff, who is involuntarily civilly confined at the Florida Civil Commitment Center pursuant to Fla. Stat. § 394.910, et. seq. ("Jimmy Ryce Act"), is proceeding on his Second Amended Complaint (Doc. #42), which remains pending against the following Defendants, in both their individual and official capacities: Timothy J. Budz, facility administrator, Dr. Jacques Lamour, a physician at the FCCC, and Barbara J. Pederson, R.N., a nurse at the FCCC.[2] The Second Amended Complaint alleges Eighth and Fourteenth Amendment violations stemming from the Defendants' alleged deliberate indifference to Plaintiff's serious medical condition. Second Amended Complaint at 7.[3] Plaintiff also claims violations of Florida's tort law for medical malpractice and negligence. Id. Further, it appears that Plaintiff is attempting to assert a retaliation claim against Dr. Lamour in connection with his decision to prescribe a psychotropic drug to Plaintiff after learning of the lawsuit. Id. As relief, Plaintiff seeks a declaratory judgment and "what additional relief he is due as far as monetary damages for his psychological and physical suffering." Id. at 11.

---

[2] On March 25, 2008, the Court granted Defendant Liberty Healthcare Corporation's and Defendant Butterworth's Motions to Dismiss Plaintiff's Second Amended Complaint. See Doc. #91.

[3] The page numbers referenced herein are to the page of the identified document as it appears on the Court's case management electronic computer filing system.

The following are the material facts alleged in the Second Amended Complaint as regards the remaining Defendants. On July 1, 2006, the GEO Group, Inc. ("GEO") assumed operations of the FCCC. Complaint at 8. On August 2, 2006, Plaintiff was evaluated by Defendant Dr. Lamour. Id. Dr. Lamour initially diagnosed Plaintiff's condition as a "tumor." Id. On September 11, 2006, Dr. Lamour "changed his mind" and concluded that Plaintiff had "a hiatal hernia." Id. Dr. Lamour prescribed Plaintiff with Zantac and Prilosec. Id. Plaintiff's symptoms, swelling and "pain" did not improve. Id.

On March 20, 2007, Plaintiff was asked to report to the FCCC Medical Department where he met with Dr. Lamour. Id. at 9. Dr. Lamour told Plaintiff he had received "additional pleadings from the lawsuit." Id. Dr. Lamour told Plaintiff that he would schedule an "MRI for him and send him to see a specialist." Id. Dr. Lamour also prescribed Plaintiff Rantidin (Zantac); Fluoxetine (Prozac); and Prilosec at this appointment. Id. On March 21, 2007, Plaintiff received "additional lab tests." Id. On March 22, 2007, Plaintiff was given the medications prescribed by Dr. Lamour. Id.

On March 27, 2007, at 9:30 p.m., Plaintiff vomited and became "very sick." Id. Plaintiff was taken to the medical department "by stretcher." Id. The nurse on duty called Dr. Lamour. Id. Dr. Lamour refused to have Plaintiff transported to the hospital. Id. at 10.

Plaintiff also learned earlier that day that he had been prescribed Prozac by Dr. Lamour.  Id.  Plaintiff saw Dr. Lamour on March 29, 2007, and inquired why he prescribed Prozac to Plaintiff without Plaintiff's knowledge; Dr. Lamour "refused to answer" Plaintiff.  Id. at 10.  Defendant Pederson, in response to a grievance Plaintiff submitted concerning the Prozac, stated that "the prescription was in error."  Id.  Plaintiff states that "fortunately, [he] had never taken the drug."  Id.

Plaintiff was "told he will be seeing another specialist." Id. at 11.  As of the date Plaintiff submitted his Second Amended Complaint, May 9, 2007, Plaintiff states that "no treatment has been given to alleviate his problem."  Id.

Defendants submit that they are entitled to summary judgment as a matter of law.  First, Defendants contend that the evidence of record reveals that Plaintiff does not have a "serious medical condition." Motion at 12.  Next, Defendants contends that, even assuming that Plaintiff has a serious medical need, Defendants were not deliberately indifferent to his need.  Id. at 13.  Finally, Defendants argue that the Second Amended Complaint is devoid of any factual allegations of wrongdoing as regards Defendants Budz and Pederson.  Id. at 14.  For the reasons set forth below, the Court finds that the Defendants' Motion is due to be granted.

**III.**

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue at to any material fact

and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if there is sufficient evidence such that a reasonable jury could return a verdict for either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the suit under governing law. Id. The moving party bears the burden of identifying those portions of the pleadings, depositions, answers to interrogatories, admissions, and/or affidavits which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259-60 (11th Cir. 2004).

To avoid the entry of summary judgment, a party faced with a properly supported summary judgment motion "bears the burden of persuasion" and must come forward with extrinsic evidence, i.e., affidavits, depositions, answers to interrogatories, and/or admissions, and "set forth specific facts showing that there is a genuine issue for trial." Beard v. Banks, 548 U.S. 521, 529 (2006)(citations omitted); Celotex, 477 U.S. at 322; Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1225 (11th Cir. 1999). If there is a conflict in the evidence, the non-moving party's evidence is to be believed and "all justifiable inferences" must be drawn in favor of the non-moving party. Beard, 548 U.S. at 529-530 (citations omitted); Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003). The court, however, "must distinguish

between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, [the court's] inferences must accord deference to the views of prison authorities." Beard at 530. "A court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" Cuesta v. School Bd. of Miami-Dade County, 285 F.3d 962, 970 (11th Cir. 2002) (citations omitted). Nor, are conclusory allegations based on subjective beliefs sufficient to create a genuine issue of material fact. Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling in a motion for summary judgment." Scott v. Harris 550 U.S. 372, 127 S. Ct. 1769, 1776 (2007). In the summary judgment context, however, the Court must construe *pro se* pleadings more liberally than those of a party represented by an attorney. Loren v. Sasser, 309 F.3d 1296, 1301 (11th Cir. 2002).

**IV.**

The Court recognizes that the FCCC is not a prison and Plaintiff is not a prisoner. Troville v. Venz, 303 F.3d 1256, 1260 (11th Cir. 2002). Instead, an individual who has been involuntarily civilly committed has "liberty interests under the

due process clause of the Fourteenth Amendment to safety, freedom from bodily restraint, and minimally adequate or reasonable training" as required to ensure safety and freedom from restraint. Dolihite v. Maughon, 74 F.3d 1027, 1041 (11th Cir. 1996)(citing Youngberg v. Romeo, 457 U.S. 307, 322 (1982)). See also Lavender v. Kearney, 206 Fed. Appx. 860, 862 (11th Cir 2006). Indeed, the Court recognizes that residents at the FCCC are afforded a higher standard of care than those who are criminally committed. See id. (wherein the Eleventh Circuit Court of Appeals held that "persons subjected to involuntary civil commitment are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.").

Nonetheless, "the Eighth Amendment's deliberate indifference jurisprudence is applicable to the Fourteenth Amendment due process rights of pre-trial detainees." Id. at 863 n.2 (citing Purcell v. Toombs County, Ga., 400 F.3d 1213, 1319 (11th Cir. 2005)(other citations omitted)). Consequently, the Court examines cases addressing medical deliberate indifference claims under the Eight Amendment for guidance in evaluating Plaintiff's claims.

"Deliberate indifference to [the] serious medical needs of [a] prisoner [ ] constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003)(quoting Estelle v. Gamble, 429 U.S. 97 (1976)); Campbell v. Sikes, 169 F.3d 1353 (11th Cir. 1999). Medical treatment violates the Eighth Amendment only when it is so

grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991).

To establish his Eighth Amendment claim, a plaintiff must prove both an objective and a subjective component. Farrow, 320 F.3d at 1243. To establish an objectively serious deprivation of medical care, Plaintiff must establish: (1) an objectively serious medical need, and (2) that the response made to the need was poor enough to constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligence in diagnosis or treatment, or medical malpractice. Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000).

A "serious medical need" is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention, and, in either case, must be one that if left unattended poses a substantial risk of serious harm. Kelley v. Hicks, 400 F.3d 1282, 1284 n.3 (11th Cir. 2005); Brown, 387 F.3d at 1351; Farrow, 320 F.3d at 1243. Deliberate indifference to a prisoner's future health can constitute an Eighth Amendment violation. Kelley, 400 F.3d at 1284; Powell v. Lennon, 914 F.2d 1459, 1464 n.10 (11th Cir. 1990).

To show the required subjective intent, a plaintiff must prove defendant acted with "deliberate indifference" by showing: (1) subjective knowledge of a risk of serious harm (i.e., both

awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists and the actual drawing of the inference); (2) disregard of that risk; and (3) by conduct that is more than gross negligence. Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005). Inadvertent negligent, or even gross negligent, failure to provide adequate medical care does not rise to a constitutional violation. Farrow, 320 F.3d at 1243. "When the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) (citations omitted).

Delay of treatment for serious conditions can rise to the level of deliberate indifference where it is apparent that delay would detrimentally exacerbate the medical problem, the delay does seriously exacerbate the medical problem, and the delay is medically unjustified. Taylor, 221 F.3d at 1259-60 (citing Hill v. Dekalb Reg'l Youth Ct., 40 F.3d 1176, 1187 (11th Cir. 1994)); Lancaster, 116 F.3d at 1425. Whether the delay was tolerable depends on the nature of the medical need and the reason for the delay. Farrow, 320 F.3d at 1247. A constitutional claim can exist for delayed treatment of a condition that does not require immediate attention. Id. An inmate who complains that delay in medical treatment rises to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay. Hill, 40 F.3d 1176. Further, the

tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay. Id.; Harris v. Coweta County, 21 F.3d 388, 393-394 (11th Cir. 1994).

## V.

The following are the relevant uncontroverted facts as gleaned from the record before the Court. Since July 1, 2006, Defendant Budz was employed by GEO as the Facility Administrator. Exhibit F at ¶2. As the Facility Administrator, Budz was responsible for overall operations of the facility, such as security and operations. Id. at ¶3. In July 2006, GEO hired Dr. Lamour, who is a licensed physician, for the Facility. Id. at ¶4. As the Administrator, Budz deferred to Dr. Cassandra Newkirk, M.D., the Chief Medical Officer for GEO concerning any medical grievances. Id. at ¶6. Budz did not have any input on issues relating to medical care for residents, but instead left these decisions to the medical professionals at the Facility. Id. at ¶7.

Defendant Pederson was the Heath Services Administrator at the Facility during the relevant time period. Exhibit E at ¶30. As the Heath Services Administrator, Pederson did not have "final decision making authority for a patient." Id. at ¶31. Rather, Pederson "was bound to follow doctor's orders" regarding patient care. Id. at ¶32.

Defendant Dr. Lamour, who is a "general practice physician," is licensed to practice medicine in the State of Florida. Id. at

¶5. Dr. Lamour examined Plaintiff on various occasions, reviewed his previous medical records, ordered various tests, evaluated the results from the tests, prescribed various medications for Plaintiff, diagnosed Plaintiff with gastritis, GERD,[4] and concluded that Plaintiff's hernia is "not medically significant." See generally Exhibit E.

In particular, Plaintiff's medical file evidences that he had a history of gastritis and acid reflex and was prescribed various medications for these conditions before GEO assumed operation of the FCCC. See generally Exhibit D and Supplement to Exhibit D. In fact, Plaintiff had previously underwent various ultrasounds of his abdomen and gallbladder, which were negative. Id. at 181-182, 85. And, Dr. Lamour's predecessor also had diagnosed Plaintiff with gastritis and GERD. Id. at 197-198.

Plaintiff first presented himself to the FCCC medical department and Dr. Lamour on July 12, 2006, complaining of abdominal pain for about a month. Id. at 18. Blood tests were ordered. Id. at 44. On July 14, 2006, an EGD (upper endoscopy) was ordered. Id. at 42, 175. The abdominal radiographs taken on July 20, 2006, which were read by radiologist Dr. David Saks, revealed a nonspecific gas pattern. Id. at 83. Blood work, taken on July 20,

---

[4]Gastro-esophageal reflux disease (GERD) is a digestive disorder that affects the lower esophageal sphincter, the muscle connecting the esophagus with the stomach. http://www.heatlth.com/health/gerd.

-12-

2006, was interpreted by Dr. Lamour and deemed "abnormal." Id. at 70-73. Dr. Lamour requested that Plaintiff's chart be pulled on July 21, 2006. Id. at 72.

A second EGD was completed on September 7, 2006, and an outside consultant, Dr. Yaremo, diagnosed Plaintiff with GERD and a hernia. Id. at 49, 50. That same day, an antrum biopsy and esophageal biopsy was completed at Charlotte Regional Hospital, which revealed a mild diffuse chronic gastritis with focal increase in fibrous tissue and chronic inflammation in lamina propria and germinal cell layer. Id. at 53. Plaintiff was prescribed Prilosec and Zantac. Id. at 42.

Due to Plaintiff's preexisting heart condition, an EKG was performed on September 30, 2006. Id. at 16. Plaintiff had additional blood work completed on October 2, 2006. Id. On October 4, 2006, Dr. Lamour interpreted the results of the blood work and found some abnormalities, but determined that they were "not clinically significant." Id. at 67. On October 5, 2006, Plaintiff underwent chest imaging, which revealed no active disease. Id. at 82.

On November 26, 2006, the Plaintiff presented himself to medical, complaining of stomach pain. Id. at 40. Dr. Lamour prescribed Prilosec and Zantac for Plaintiff on November 27, 2006. Id. at 95. Plaintiff again complained of abdominal pain on January 22, 2007. According to the file, all imaging, including abdominal

x-rays, ultrasound and chest x-rays were normal. Plaintiff was to be monitored and was given Tylenol. Id. at 14-15.

On March 7, 2007, Plaintiff requested another evaluation for his stomach pain and advised staff that he stopped taking his medication the previous month. Id. at 11-12. The next day, March 8, 2007, Dr. Lamour prescribed Rantidine (Zantac), which is used to control stomach acid. Plaintiff also had additional bloodwork done by Quest Diagnostics, which was deemed "abnormal" by Dr. Lamour. Id. at 65-66. Plaintiff was to continue the use of Rantidine through July 5, 2007. Id. at 112.

On March 14, 2007, Plaintiff underwent an abdominal sonogram, which, as read by Dr. William Hearn of Mobile Ultrasound Services, did not reveal any "evidence of acute pathology." Id. at 80. On March 19, 2007, blood testing was again ordered. Id. at 10, 36. On March 23, 2007, Quest Diagnostics completed the testing and Dr, Lamour interpreted the results to be "out of range" but "not clinically significant." Id. at 63.

On March 27, 2007, Plaintiff presented himself to the medical department, declaring a medical emergency with complaints of nausea, vomiting and diarrhea. Plaintiff was admitted to the Facility's infirmary and was kept overnight for observation. Id. at 9, 35. The next day, additional blood work was completed by Quest Diagnostics and the results were reviewed by Dr. Lamour, who concluded that some of the results were "out of range," but that they were not "clinically significant." Id. at 61.

On June 19, 2007, Dr. Lamour again prescribed Plaintiff Rantidine. Id. at 110. On July 4, 2007, Plaintiff again presented himself to medical, complaining of stomach pains. Plaintiff was diagnosed by another FCCC physician, Dr. Parekh, with gastritis. Id. at 7-8. Plaintiff was advised to continue taking Prilosec and Zantac and a CT scan was ordered. Id. The CT scan of Plaintiff's abdomen was done at Desoto Memorial Hospital on July 16, 2007, and revealed the following: (1) 3.4 cm diameter right paraumbilical ventral hernia with 10 mm neck; (2) innumerable bilateral nonobstructive renal stones; and (3) probable hepatic cysts. Id. at 76-77.

Plaintiff had additional blood work done on August 15, 2007 by LabCorp, which was reviewed by Dr. Lamour, who determined that the results were "abnormal" and requested to have Plaintiff's chart pulled. Id. at 60. Plaintiff underwent an abdominal ultrasound on August 17, 2007, which was normal. Id. at 74. On October 2, 2007, Plaintiff was examined by Dr. Lamour, who noted that Plaintiff was doing better with complaints of only occasional heartburn. Id. at 1. At that time, Dr. Lamour diagnosed Plaintiff with anemia, heartburn and GERD. Id.

<u>Defendants Budz and Pederson</u>

Plaintiff's Second Amended Complaint contains only a one passing reference to Defendants Budz and Pederson.[5] Nowhere does

---

[5]Defendant Budz "ignored" Plaintiff's grievance forms. Second
(continued...)

the Second Amended Complaint allege that either of these Defendants personally participated in the alleged constitutional deprivation. Brown v. Crawford, 906 F.2d 667, 671 (11th Cir.) cert. denied 500 U.S. 933 (1990). It appears that Plaintiff may have included these Defendants in this action due only to their respective supervisory positions. However, § 1983 claims predicated on *respondeat superior* theories have been uniformly rejected. Monell v. Dep't of Social Services, 436 U.S. 658, 690-692 (1978); LaMarca v. Turner, 995 F.2d 1526, 1538 (11th Cir. 1993), cert. denied, 510 U.S. 1164, 114 S. Ct. 1189 (1994). Further, the Second Amended Complaint does not contain any allegations of a policy, custom or practice on the part of either Defendant Budz or Pederson that was the "moving force" behind Defendant Lamour's alleged misconduct. Board of County Commissioners v. Brown, 117 S. Ct. 1382, 1388 (1997), see also Jones v. Cannon, 174 F.3d 1271, 1292 (11th Cir. 1999), Tennant v. Florida, 111 F. Supp.2d 1326 (S.D. Fla. 2000).

Further, to the extent that Plaintiff attributes liability to Pederson because she responded to Plaintiff's grievance and Budz because he failed to respond to any grievance, such allegations fail to state a cause of action. Dunn v. Martin, 178 Fed. Appx. 876, 878 (11th Cir. 2006). Consequently, the Court will grant Defendants' Motion as to Defendants Budz and Pederson.

---

[5](...continued)
Amended Complaint at 9. Defendant Pederson answered Plaintiff's grievance regarding the Prozac prescription. Id. at 10.

Defendant Lamour

There is clearly no evidence in the record that Plaintiff's abdominal condition, if left unattended, posed a substantial risk of serious harm. Kelley v. Hicks, 400 F.3d 1282, 1284. Nonetheless, without determining whether Plaintiff's abdominal condition constitutes a "serious medical condition," the Court finds that there is no evidence to support that Defendant Lamour was deliberately indifferent to Plaintiff. To the contrary, the evidence reveals that Dr. Lamour's medical treatment of Plaintiff was attentive. As demonstrated by the record, Plaintiff: (1) was routinely and consistently seen and examined by medical staff; (2) was prescribed medications to alleviate his symptoms; (3) was transported off site on several occasions to outside medical facilities for additional testing and evaluations; (4) was examined by off-site specialists; and (5) routinely had his blood work monitored.

Moreover, even if Dr. Lamour reached an incorrect diagnosis concerning Plaintiff's abdominal problem, such a claim sounds more in medical malpractice, rather than a conscious disregard or deliberate indifference to a known medical need. Plaintiff's disagreement with Dr. Lamour as to the proper diagnosis of his abdominal condition or Plaintiff's preferred course of medical treatment does not give rise to a constitutional claim.

Further, the Court finds retaliation claim wholly without merit. By Plaintiff's own admission, Dr. Lamour requested to meet

with Plaintiff to discuss his medical concerns as soon as he received Plaintiff's legal papers. In fact, Dr. Lamour agreed to send Plaintiff for additional testing and an outside evaluation at this meeting. Thus, the Court finds that based upon the record there is no evidence to support Plaintiff's claims against Dr. Lamour.

Because the court is dismissing Plaintiff's federal claims, it chooses not to exercise supplemental jurisdiction over Plaintiff's related state law claims, if any. See 28 U.S.C. § 1367(a) and (c).

ACCORDINGLY, it is hereby

**ORDERED:**

1. Defendants' Motion for Summary Judgment (Doc. #97) is **GRANTED**.

2. The Clerk of Court shall enter judgment accordingly, terminate any pending motions, and close this file.

**DONE AND ORDERED** in Fort Myers, Florida, on this ___10th___ day of August, 2009.

JOHN E. STEELE
United States District Judge

SA: hmk
Copies: All Parties of Record